OPINION of the Court, by
Judge Bibb.
— Ward in ejectment vs. Lee, by virtue of a grant, bearins date on the 19th day of July, 1786, pursuant to a survey, executed by authority of a treasury warrant, entered on the 10th day of April, 1784, in the name °* sa‘d Ward, as assignee of Joseph Matthews, for 2000 acres.
Lee exhibited his bill in chancery, praying an injunc-aSa'nst this judgment at law, and for a conveyance of the elder title for so much of the 2000 acres as interfered with his prior equitable claim, derived as here-jnafter sej forth ; and alleging also, that Ward has sur-veyeu contrary to his location*
The first claim set up by Lee, is derived under a pre-emption certificate, obtained by Thomas Young from the county court of Fayette, as follows : “ At a court held for the county of Fayette, January 13th, 1784.— AppKcation and due proof being made, this court doth certify, that Thomas Young is entitled to the pre-emp-ti0n of 1000 acres of land, lying on the waters of the nor^1 J01'⅛ °f Licking, and on the north side thereof, about four oi-jive miles from the mouth of Limestone, a southerly course, beginning 200 poles north west oí ^ls improvement, and running thence east 400 poles, thence south 400 poles, thence west 400 poles, thence *19 north 400 poles, including his improvement; by virtue of his improving the same, and his being in the public service when the commissioners sat in the Kentucky district, and thereby prevented from making application for the same.”
Where a preexisting right is affected, the effect of the certificate will be» to permit the party claiming* under it to iu>~ ply, by proof» that, wiies ein the certificate* by reafon of its generality, is defective — the adverfary being permitted to rebut that- proof*
The county courts had no authority to un-brace the application of thfc grantee of a cer-’ tificate of preemption, to amend his location at a term fubfequent to the grant of the certificate;
The commis-fioners might permit an amendment at any time during their fitting.
Perjuajion ufed by a perlón to prevent an in» terference with his claim by a«. nother, is no ground for a bill in equity,
A location of a pre-emption infufficient, be» caufe the im« provsment £⅛ led for was not notorious, and the defcription thereof imperfect and deceptive.
*19 On the 24th December, 1784, Thomas Young’s pre-' emption warrant was issued, and on application to the Fayette county court in May, 1785, this order was made, viz. — “ Leave is given Thomas Young to amend the location made by him for his pre-emption, in the following manner, to wit: instead of beginning 200 poles north west of his improvement, to begin 300 poles north west of his improvement, then to run the courses, and distances given in his first location.”
On the 13th of J uly, 1785, Thomas Young made his entry on his pre-emption warrant aforesaid, “ — —lying on the waters of the north fork of Licking, about 4 or 5 miles, and nearly a south course, from the mouth of Limestone ; beginning 300 poles north 45 west from his improvement, and running south 400 poles, thence east 400 poles, thence north 400 poles, thence west 400 poles, to the beginning, including his improvement.”
Lee charges, in an amendment to his bill, that Simon Kenton (whom he makes defendant) induced Young “ to make his location, in his first certificate, different from what he intended, and from what he would have done, had it not been for the representations and persuasions of the said Kenton.” These persuasions and representations are stated to have been made in a conversation between Young and Kenton in the fall oí 1783; in which, Kenton insisted that Young should make his location, in his certificate, in such a manner as to include his improvement a small distance in his west line, and extend east for quantity that Young objected, that such a location would run his land into the Limestone hills ; but that Kenton assured him it would not — that lie would get as good land as by locating it in the manner Young intended; which said last manner, Kenton told lioung, would interfere with some entries made by himself, the said Kenton. — It appears that Kenton, at that time, claimed part of the land in controversy. The bill farther states, that Young, finding himself deceived and misled by Kenton, procured the amendment of his certificate as before recited.
Couchman and Thomas, cited and recognized by the court as correct,
Defcription of improvement does not aiiude toWells’s creek although that Hream was well known by that
To preferve the dignity of pre emption, the location in the certificate muft be ipecial and defcriptive, it is not luifi-cient that the entry with the furveyor is fo.
JVt Cunaban vs Berry, Hug J77 —Bryant and Oioings vs.PVal lace, Hog zog-jo -Myers vs Speed, Hug.99Joo.
Claim invalid as a pre-emp tion, yet^good as a treaiury warrant, on account of theno-toriety of the improvement before the entry with the furveyor — not-' withftanaing the office was ihut for ifiuing treafury warrants before county court granted certifi-care oí preemption jVj-chols “vs. TVeils, p.r. dec, 307-^1 Greenup vs. Kenton, Har.15.
*20 By another anaendnient to his bill, Lee also sets up a claim, derived under a survey of 160 acres, made in September, 1798, purporting to be, by virtue of au entry, (on a treasury warrant,) made on the third day of June, 1780, in the name of George Summers, which calls to adjoin Charles Morgan’s entry of 467 acres (made on the same day) on the south west. This claim, upon the same evidence, and between Ward, Kenton, &c. vs. Lee, has been considered, and decreed to be invalid; and therefore need not be farther noticed.
The answers of the defendants put in issue the equity set up by the complainants, in all its ramifications ; and to rebut the equity claimed in the bill, the answer of Ward insists on the validity of the entry on the 10th of April, 1784, as aforesaid, which is in these words and figures : “ William Ward, assignee of Joseph Matthews, enters 2000 acres of land, on a treasury warrant, No. 9929, beginning on the north side oí the north fork of Licking, at a hoopash, buckeye and hickory, by the side of a branch, corner to a survey made for William Ward, of Botetourt county, and running with his line, the same course, N. E. 800 poles, thence S. 45 E. 400 poles, thence at right angles to complete the quantity:”1 and also, on the validityof an entry made on the 19th of April, 1780,as follows: “ William Ward, heir to James Ward, enters 2000 acres of land, by virtue of warrants for military service, performed by the said James in the last war in Kentucky, on a branch of the northforkof LL¡:i.>g, called Wells’s branch, including the month thereof, joining Cameron’s settlement and pre-emption on the west side, and Beckley’s on the south ; to begin at the head of said branch and run down for quantity.” Cameron and Beckley respectively, had, at that time, obtained certificates of their right to settlement and preemption, and had recorded their certificates with the surveyor, but had not located their pre-emptions. Their certificates, and entries of their respective settlements, with the surveyor, are as follows :
“February 18th, 1780. — Angus Cameron this day claimed a settlement and pre-emption to a tract of land, in the district of Kentucky, on account of residing in the country 12 months before the year 1776, lying at the head of the right hand fork of Wells's branch, extending south east to the head of a small run that empties *21 into the north fork of Licking;, including the spring oti the head of both branches, about one and a half mile above the toar path, that crosses the north fork ; satisfactory proof bdd^ made, &c.”
An entry to adjoin a juiveyt made but a ihort time before, I’o that no copy of it could be obtained, cannot be helped bythe defcripiion contained in the certificate of lurvey. — Vide Nenie vs Galloway, poft,
That all fur-veys are conformable to entry, would be a rafh. prefump-
An entry, to operate as notice to fubfe-quent locators, mull contain a certain direction, by reference to fome certain object of notoriety, from which a fearch could be commenced ¿⅛ purfued to the beginning — Coucbman ysa Har_ 271 — Crow’s hfff^ Mafin,Har.73.
,rilf cfu/or the bead of a ^ where common reputation has not fixed it, is (in general) 'vague and uncertain. It may be an object of pie-cife location, where nature or reputation has éíilinguished it as iuch,— Bryan 'us. Btad-fordi Hug, 61 • — 4Taylor vs. Kincaid, Hnc.Sz
*21 “ February 28th, 1780. — -Angus Cameron enters 400 acres in Kentucky, by virtue of a certificate, &c. lying, &c.” as in the certificate, except that ‘‘ run” is changed to “ creek.”
William Beckley’s certificate of his right to a settlement and pre-emption, issued on the 11th of January, 1780, and on the third of February next ensuing; his settlement was entered with the surveyor as located in his certificate, viz :
“ William Berkley enters 400 acres, in Kentucky, by virtue of a certificate, &e. lying on the waters of Licking creek, and on the head of the first left hand fork ot Lawrence’s creek, about four miles from the mouth of Limestone.”
Various questions of general concern, arising under the different legislative provisions of the General Assembly of Virginia, and many' cases of constructions of entries, and many questions of fact, upon which the parties have heaped volumes of depositions, have been agitated at the bar — those which appertain to the claim of the appellee, who was complainant in the court below, and which are necessary to the decision of that branch of the case, may be embraced under the following heads :
1st. Was Thomas Young one of those persons whose case came within the description of claims which ■ the county courts were authorised to hear and determine ?
It appears from the evidence, that Young resided in the state of Virginia ; that he was an officer in the year 1779, and until the end of the revolutionary war, in the Virginia state line, and as such engaged in the public service of that state during the sittings of the commissioners in the Kentucky district. If these facts had been made out to the county court of Fayette, ('and , , , , , - , . , V moreover that he had improved previous to the first day of January, in the year 1778, as required by' the act of 1779,) the county' court were authorised to grant the application as made. That these facts were made out to the satisfaction of the county court of Fayette, appears from the certificate of their adjudication. The 1 4 . , * - \ r . , • i , , particular kind or public service, or trie period at which *22 the improvement was made, is not stated in the certificate, but a sufficiency is stated to shew that the county-court acted within the pale of their authority, whereby the legal presumption attaches, that all things are rightly done in a court of justice, in cases affecting the commonwealth only, this presumption ought to have its full force ; and there it might well be said, “ stabitur presumptio, donee in contrariamprobelur” — nav, farther, where the adjudication interfered with no private right then existing, and the certificate granted does not on its face express a case not -warranting the adjudication, but is expressed in such general terms as may comport with the. law, there the Commonwealth, being represented by her officers, in making the adjudication, ought to be concluded j and therefore, all subsequent claimants from the commonwealth, must likewise be concluded. But when a pre-existing claim is affected by the adjudication, and such claimant was not a party in court at the time — -not notified to appear and uphold his right, or contest the adversary claim, there he cannot be concluded. — (Accord. Nichols vs. Wells, pr. dec. 306 — 7, Greenup vs. Kenton, Har. 14-15.) In such case, the proper effect of the certificate seems to be this — that the presumption arising out of the general expressions in the certificate, shall be so far indulged, as to permit the clai-. mane to supply that, by proof, wherein the certificate, on account of its generality, is dencient-^-the adversary being permitted to rebut that proof, Thus, each party will be fairly before the court, upon the justice of their respective claims. As it would be unjust to conclude the one party by a decision, against which he had never had a reasonable opportunity of defending his previous conflicting claim, so it would be unjust to conclude the holder of the certificate, by the omissions of the court to give him a certificate sufficiently detailing the case which he had made out, and supported by satisfactory evidence. The presumption growing out of the general expressions in Young’s certificate, is well fortified by the evidence. It is evinced, that Young had improved in 1775 — uvas one of the “ good people1’’ of the commonwealth of Virginia, as the act of the Pvíay session of the year 1781 expresses — that he was engaged in the public service of that state, and thereby pre-* vented from laying in and proving his right ot pre-emp • *23 Uon in dus time ; whereby he was authorised, by the said recited act, to make his application to the county court.
To meander and delineate many branches of a ftceam to afeertain the head, would be an unreasonable diligence toirn-pefe upon a iub-sequent locator. '"~Pfbit&ker vi. Hailj poft,
An entry to include the mouth of a creek well known, and to join C, on the v/eft and B. on the Couth, not Supported for want of evidence to give pveciCe locality to the claims of C* and B.
; A call for fet-tlement and pre emption, when the preemption was not ¡neared,fhallbe conftrued tc> adjoin the iettlement only. — * See Craig vs. Macb¡rf d.úte 3 0
*23 2nd. The second question is — Could the county court, at the May term, 1785, properly grant leave to amend the certificate issued by their order at a former term ?
We think the court had no authority to embrace the application at a term subsequent to the grant of the certificate. The power given to the county courts, was an extraordinary and special authority, which, when once executed, ceased. The whole term of a court is, in law, for many purposes, considered as but one day — particularly for the purpose of correcting and amending. — But the term once elapsed, the power of the court over their proceedings and final judgments is gone — except so far hs clerical mistakes, apparent on the record, require amendment: but it is no where to be found, that a court, at a subsequent term, can amend a judgment or decision, so as to change the merits of the case, without any thing of record to amend by. Young’s application was made to a court not having his case depending before them — the amendment proposed, was not governed by any part of the record, but by a change in the mind of the applicant. Moreover, Young had obtained his pre-emption warrant by virtue of the former certificate ; thus, he had (to a certain extent) obtained the benefit of the former certificate, and so had no right" to ask an amendment. As well might it be said, that the court should, at a subsequent term, have heard the complaint of one with whom the certificate was likely to conflict. It was said, that commissioners, who satin this district, were in the habit of permitting the parties to amend and change their certificates ; be it so — yet the cases are not parallel: the sittings of the commissioners may all be regarded as one continued session, for the exercise of one delegated authority ; they might, on any day before their authority expired, have heard the complaint of one who thought himself aggrieved by their decision, upon good cause shewn. Here it is convenient to notice that part of the complaint which is made against Kenton, as the instrument of misleading Young in his first location : whether the complaint is founded on fact, need riot be said j for taking the state *24 ment as made by the bill, it is too feeble a foundation to build a decree upon. The charge is but that of “ persuasion” with the object, openly avowed, of preventing interference with Kenton’s claims — that Young was induced to locate his claim “ different from what he intended’’ — but how he intended to locate it, without, or before Kenton’s persuasions were used, is left to conjecture ; so that the truth or falsehood of Kenton’s representation about the Limestone hills, if it were material, cannot be traced. Debilefundamenium fallit opus !
3dly. Having confined the claim of Young to the first certificate, the next question which arises is — Does that certificate specify the location of the land to which the grantee had thus asserted the right of pre-emption ?
The locative calls of the certificate, are all dependent on Thomas Young’s improvement. According to the principles decided in the case of Couchman vs. Thomas, which have since been approved by the judges who did not sit in the cause,) the course and distance from the mouth of Limestone, as called for in Young’s certificate, when compared with the situation of his improvement, as now claimed, are fallacious. Separately or conjointly, they apply with more truth to other improvements on the waters of the north fork of Licking. The location, therefore, must depend for support on the question respecting the notoriety of Young’s improvement; for the kind of improvement is not stated, nor the stream on which it is to be found, although the notoriety of Wells’s creek afforded a convenient opportunity for giving such a reference. In 1775 and 1776, improvements on the north fork of Licking and its waters had been made, by Wells and company, and by others. Wells and company, of whom Young was, left the country in 1775, immediately after they had made their improvements. This company7 made nine improvements, all of the same kind, most of which were allotted to different persons of the company after they were made. Some of the company returned in 1783, some returned about twenty years after they had improved, and some never returned. It appears that, as early as 1776, Simon Kenton had discovered, and communicated to Stockdon and others, who were about to improve on Wells’s creek, that Wells and company had improved in that neighborhood the year before ; but it does not appear that *25 Kenton then knew to which of the persons, composing Wells’s company, the improvements respective^ belonged, or that he knew Young’s improvement. From this period until the latter part of the year 1784, there is no evidence -in the record respecting these improvements ; and there is indeed a great dearth of testimony as to Young’s improvement, until after he had obtained ins certificate. It seems clear, that previous to that time it had not acquired notoriety ; but that before the location of his pre-emption warrant with the surveyor, the improvement claimed as Young’s, had become notorious as such. At the date of the certificate, therefore, Young’s claim was uncertain ; because the description, independent of the improvement, was indefinite and deceptive, and the improvement, when brought in aid, had not acquired such notoriety as could correct the errors, uncertainties and omissions of the claimant in his other descriptions of his land.
4th. Upon this statement, a fourth question is presented by the court, deemed worthy of consideration. — ■ To preserve the dignity of the claim, must the certificate of pre-emption, for improving, contain a sufficient location, or was it sufficient that the pre-emptioner made it identical and specific when he entered his pre-emption warrant with the surveyor ?
That the certificate was to contain the location with precision, seems to have been the contemporaneous exposition of the statute, during the sittings of the commissioners, and since that time has been kept up by the legislature.
The original act of 1779, required that the certificate of right for settlement, should describe “asnear as may be, the particular location.” In cases of adjudication of the right of pre-emption, that a certificate should “ in like manner” be delivered, “specifying the quantity and location of such land.” — (Chan. Rev. 93) Again, in the act of May session, 1783, (Chan. Rev. 206) farther time was given “ for locating warrants, upon pre-emption rights, as specially described in the certificates by which such rights are held.” The same idea is to be collected from the act of 1782, (Chan. Rev. p. 169, ch. xlix, sec. 7) by which it was declared, that a pre-emption warrant might be located and surveyed “ on any waste and unappropriated lands within the *26 district, without exchanging the same : provided, they do not have any force #f pre-emption, but shall be equal, and on the same footing with treasury warrants.” In M'Clenahan vs. Litton, (Hugh, Rep. 181,) the idea of location with the commissioners, of a pre-emption for 400 acres, for actual settlement, subsequent to the first of January, 1778, is inculcated. In the case of Bryant and Owings vs. Wallace, (Hugh. Rep. 209-10,) the point is expressly decided, that a certificate of preemption for improving, should have “ contained such a description of the situation, that subsequent locators, on reasonable enquiry, might have found itagain it is said, in speaking of the entry on such a pre-emption warrant with the surveyor, “->it can only be proper to recur to the location with the commissioners, and compare it with the entry with the surveyor, for the purpose of discovering the dignity of the claim.” As the certificate of Young’s right of pre-emption was devoid of certainty and precision, his claim must lose the dignity of pre-emption, for his own fault in failing to devise and give in a sufficient location. As a claim reduced to the level of a treasury warrant, the entry on the 13th of July, 1785, is certain and special, by reason of the then acquired notoriety of the improvement called for. Hence, arises the fifth question — -
5th. Can this entry held as a treasury warrant, although founded on a land office warrant, which emanated subsequent to the time at which the register of the land office of Virginia was required to cease issuing treasury warrants ?
This point was made by the counsel for the appellant ? but a little attention will show it is but a sophism. The time for obtaining and entering pre-emption warrants had been extended beyond the time at which Young’s warrant was located, by express enactions ; the register was required to distinguish between other treasury-rights and pre-emption rights, by specifying in the warrants the rights upon which they were due. To-every pre-emption warrant, a double privilege attached, (particularly under the act before recited, Chan. Rev. 169) first, to hold the land, described in the certificate, by-relation to the time of improvement; secondly, of being located on any waste and unappropriated land; in the latter case, descending from their elevated priority *27 io the rank of common treasury warrants. — (Accord, Nichols vs. Wells, Pr. Dec, 306 — Greenup vs. Kenton, Har. 15.) Young had obtained his pre-emption warrant “ in legitimo modo” it therefore carried along with it the double privilege : he had lost the greater, by his own neglect in making the location in the county court; he had supplied the lesser, by his entry with the surveyor.
Note. — Same principle^ Cleland's heirs vs. Gray, dev'tfee of Weeden, OcU 1808 — Neale vs. Galloway, fall term i8oy^Feyton vs, Geedlet — Key vs* Mat jan, Har* 75.
6th. This makes it necessary to consider the entries of Ward, which are prior in date to Young’s. That of the 10th of April, 1784, depends on a survey made for William Ward, of Botetourt, on the 18th of March preceding, by virtue of an entry, (on a treasury warrant,) of the 13th of January preceding, as it now appears in this contest. There is no attempt to prove the notoriety of the survey for Ward, of Botetourt, called to be adjoined; the attempt .was, to support the entry, by the description given in the survey itself, connected with the entry upon which it purports on its face to have been made. But the survey for Ward, of Botetourt., had been made but twenty-three days before ; there is no proof that it had been even returned to the surveyor’s office ; if it had been returned and recorded, yet no person was entitled to a copy. Thus, this description, which is supposed to be contained in the survey to be adjoined, is disjoined* from the entry in question, and the location left for position to the vague and obscure call for a “ hoopash, buckeye and hickory, by the side of a branch, corner to a survey of William Ward, of Botetourt county.”
The position is correct, that a survey not notorious in the country, but which can, by reasonable diligence, be found by the description contained in the certificate of survey, may be a good object of location, provided it has been recorded so long, that every one, who will, may demand a copy. But it is not to be understood, that the survey for Ward, of the 18th of March, 1784, contains such description. On the contrary, that certificate of survey would afford but little additional aid to the location, unless the entry, by virtue of which it purports to have been made, should be also referred to as *28 an auxiliary, connected with a supposition that Ae sur» vey had been made conformable to entry. The presumption that all surveys are conformable to entry, would indeed be rash ; yet in this individual case, a strong coincidence appears on the face of the entry and* survey. But when the entry is consulted, the description of the beginning is far from being satisfactory. The descriptive part of Ward’s (of Botetout) entry is-, “-one thousand acres of land,-- on a branch emptying into the north fork of Licking, on the north side, being the second branch from said north fork, along the road made by Smith and others ; beginning at a hoopash, buckeye and hickory, on the south side of said branch, 340 poles below said road, running north 45 west, crossing said road, &c.” Wells’s creek, where the entry is said to lie, is not called for, although then generally known: Smith’s road had not acquired notoriety by that name; and where the road led to from the north fork, is not described in the entry, to assist a subsequent locator in deciding, that either the old buffaloe road to Limestone, or the -war road, was intended, however much each or either might have attracted the attention of himself, and all others acquainted in that part of the country. So that even if this entry of the appellant, Ward, were indulged in this latitude, overlooking minor objections, yet it would be destitute of any certain direction, by reference to some certain object of general notoriety, from whence the search could commence and be pursued to the beginning. Without such reference, no entry can answer the requisition of notice to subsequent locators.
7th. The seventh question is — Whether Ward’s entry of the 19th of April, 1780, is valid ?
The settlements and pre-emptions of Cameron and of Beckley, are village rights, called to be adjoined by Ward, before the appendant pre-emptions h*ad been located. According to the principle decided in the case of Craig vs. Machir, the entry of Ward must be construed to call for the settlements only. Although Lawrence’s creek and Wells’s branch were well known by those names previous to the year 1780 and since, as well as the north fork of Licking, yet neither of those settlements can be supported as good locations : the head of the right hand fork of Wells’s branch, called for by Ca *29 meron, is uncertain ; for it is well known to be doubted, to which of several branches that appellation should be attached: the “ small run" intended, is equally uncertain ; this call could only apply to one or other of several runs making into Strode’s run, which empties into the north fork ; but which of them, cannot be reasonably certain from the data in the entry. Nor can any more precise figure of a survey for the entry be deduced from the expressions, “ including the spring on the head of both branches, about one and a half mile above the war path-.”
The calls in Beckley’s settlement, are likewise vague and indefinite. What waters of Licking, and which is the head of the first left hand fork of Lawrence’s creek, to be included by the entry, and how to be included, cannot be ascertained, with any reasonable certainty, by the report of survey, or other evidence in the cause. The distinction which was attempted between Wells’s creek and Wells’s branch, is not well founded. The distinction was unknown at the date of the entry ; and Wells’s branch is expressly stated by the entry to be a branch of the north fork of Licking, thereby clearly explaining, that the stream emptying into the north fork, and not a branch of that branch, was intended. Wells’s branch had no reputed head ; this call could only have been sought for by tracing up the stream. The different branches into which this creek is divided and subdivided, as you ascend, would have imposed upon the holder of a warrant, the labor of meandering, measuring, and delineating them, before he could venture to say he understood what was meant by the head. But even after this diligence and labor, which, from the extent and variety of the branches, would have been an unreasonable imposition, he would have been indoubt and difficulty. Nature has given this stream many sources, but has not designated either as being pre-eminently the head. There are many streams, of which it may be said, that a call for the u head” is definite and certain according to nature, without the aid of reputation ; but this is ne t one of them. But, generally speaking, the head of a wafer course, where the common consent of those acquainted with the stream has not fixed it, is a vague and indefinite object of location. It may serve as general description to lead into the neighborhood of more definite objects ; *30 but if used with intention to give specialty and precision,, will generally perplex and bewilder, and fall far short of the intent. Such is the effect of the call in the entry in question, “ to begin at the head of said branch.’” These expressions, therefore, like those, “joining Cameron’s settlement and pre-emption on the west, and Beckley’s on the south,” must be declared uncertain. Rejecting the call for the head of the branch, the entry has nothing to determine the length of the line, which, including the mouth of the creek, would serve as abase, unless Cameron and Beckley could be fixed. ít is evident, that the relative situation of those claims to each other, or of the one or the other to the creek, in approaching or receding from it, would materially affect and change the position of Ward’s claim, which calls to adjoin them. For in proportion to their approximation to each other, the base of Ward’s claim must be shortened, so that extending up from the mouth of the creek, Camsron’s might be adjoined on the “ west side,” and “ Beckley’s on the south and in proportion as either Beckley’s or Cameron’s line approached, or receded from the creek, in that proportion, the corresponding side line of Ward (projecting in a parallel direction with the general course of the creek, or otherwise,) must likewise approach, or recede from, the creek. But if the head of the creek were conceded, yet the figure of the survey must depend upon, or be affected by, the positions of Cameron and Beckley, as before. All the calls of location being uncertain, except that for the mouth of the creek, the entry must be void also for uncertainty ; unless artificial rules of arbitrary construction are applied to the call for “ including the mouth’*' óf Wells’s branch, and the entry thus, redeemed from the cloud of uncertainty in which it is lost. That would,, indeed, be making a new entry, and violating a plain corollary from the cases of Craig and Johnson vs. Doran and Ashley, Cox vs. Smith, and Craig vs. Machir.
Neither of the entries set up in. Ward’s answer to ■ rebut the equity of the bill, can avail him ; he can only hold by the strength of his elder grant, upon which he recovered in ejectment, and is the only claim put in issue in the bill.
The decree of the circuit court, in sustaining the said entry of George Summers, and in sustaining the claim *31 of Thomas Young as a pre-emptive right, is erroneous. Nor is the commentary, in that decree, upon the case of Nichols and others vs. Wells, deemed more correct.
It is therefore decreed and ordered, that the said decree of the Mason circuit court be reversed, and it is hereby set aside and annulled ; and the cause is remanded to the said court; hereby directing that court to dismiss the bill with costs, as against the said defendant, Kenton : and as against the other defendant in the bill, it is directed, that the claim of the said Thomas Young, as entered with the surveyor on the 13th of July, 1785* be surveyed according to the special calls of said entry, beginning three hundred poles north 45 west from said Young’s improvement, as represented and reported on the plat returned in the cause; running thence south 400 poles, thence east 400 poles, thence north 400 poles, thence west 400 poles, to the beginning ; and to cause so much of the interference between the said elder grant, obtained upon the survey of said Ward’s entry, of the 10th of April, 1784, with the actual survey made of said Thomas Young’s claim, and which will also be within the bounds of his said entry, surveyed according to the aforegoing directions, to be ascertained by metes and bounds ; that for the said interference, so as aforesaid ascertained, the said Ward, and all others claiming under him, be perpetually enjoined from proceeding on his judgment, aforesaid, in ejectment; that, by a decree of said court, he be directed to convey, on a day to be assigned by said court, to the said complainant, Henry Lee, by deed of release and quit claim only, the elder title of him, the said Ward, in and to the said interference ; and as to the balance of the land surveyed for said Young, and not included in his said location, when so as aforesaid rightly surveyed, it is directed, that, by the decree of the said court, the complainants3 injunction be dissolved, and the said appellant, Ward, permitted to have the benefit of his judgment at law ; and it is farther directed, that as to so much of the said complaint as is predicated upon the entry of George Summers, the injunction be dissolved, and the bill dismissed, with costs to be taxed, as incurred on account of the introduction of said claim into the controversy ; and it ⅛ farther directed, that said court cause such farther proceedings to be had, as may be necessary to car *32 ry sato effect the aforegoing decree, according to the principles contained in the opinion of the court, and to do right and equity between the parties ; and finally, to make such decree as to costs, (other than those relating to Summers's entry aforesaid,) as may be equitable.